Good morning, Your Honor. May it please the Court, Michael Tanaka, Deputy Federal Public Defender, appearing on behalf of Mr. Garcia-Salas. I'd like to briefly address the informant disclosure motion and then we'll go into the new trial motion. With respect to the informant disclosure motion, generally, disclosure of an informant might be necessary for a fair trial where the informant might have relevant evidence. In this case, we're a little bit handicapped because given the procedure in the district court, we have no really idea who the informant might be. So we're going to have to look at the informant disclosure and who the informant is. I'd like to point out there's also a difference between the interest at stake in disclosing the identity of the informant and having a procedure where that discussion takes place, an in-camera procedure. Here, the district court kind of had a hybrid procedure in that she ordered the government to disclose the identity of the informant to her, but at the same time excluded defense counsel from that discussion. That's correct, Your Honor. And then actually found out the identity and found out what the informant would testify to, correct? I mean, wouldn't that give the court a way to look at it and determine whether in doing the balancing? It would certainly give the court more information, but then it also puts the court in the position of being an advocate for the defense. Now, certainly, lots of judges are capable of taking that role, presumably, but it's not the same as having a defense counsel there who's familiar with the case and can respond to the spur of the moment to what actually the information is. We can give the court general parameters of what we're looking for, but it's not nearly the same as having an active participant, an active participation defense counsel, who knows the case and who can maybe see things that a judge just is not aware of. And for that reason, this Court has, in the past, sanctioned that procedure, and there's really nothing, no interest, no countervailing interest for excluding defense counsel from that discussion. What evidence is there in the record that this was more than just a tipster, that this person was more than a tipster? There's not very much evidence at all, but that's going to be the case in a lot of these cases. The defense is obviously operating at disadvantage. The defense can offer informed speculation as to who that person is based on the circumstances of the tip and how it's handled. Well, if I were going to play the devil's advocate, it didn't seem that the defense had a really well-set-out theory of the defense that just said, well, it could be this, it could be that. And obviously, why wasn't this just a fishing expedition? Well, in some sense, the defense could not point to a specific person, but there was alternative theories. I mean, he's in a position where he doesn't really know, but he does know, presumably, that this material was not his. So there's only two ways that it could have gotten there. One, someone setting him up, or two, it was inadvertently placed there. Now, either one of those. Now, this was in the fly of his pants, correct? It was in the crotch area, that's correct. And how big was this package? The record's not real clear on that, but some of the testimony was that it was bulky without giving any dimensions. Now, on the other hand, the officer who first sighted it said it was bulky, but again, that testimony is somewhat suspect, given that when he started his search, saying that it was evident that he could see it, he started the search at those pants legs and worked up from there. So one would think that if it were that evidence, he might have probably gone right to that spot to begin the search. So it's not all that established that this was bulky enough that the man knows it, but again, the defense was that he didn't know it was there, and he was entitled to explore that. But wouldn't your rule be true in every case? In other words, if you say, look, while I can't identify a particular theory of defense, I think I was framed, other than that, and therefore I'm entitled to find out the identity of the confidential informant. That would be true in every case. Where a defendant says I'm innocent, wouldn't it? Well, if the defense has no knowledge and the informant possibly has evidence more than that, certainly he would be entitled to an in-camera hearing it where that name is disclosed, and he's entitled to explore that. There's not very much cost associated with that. Well, you say that there was no in-camera. There was a submission in camera, wasn't there? Yes, there was, Your Honor. Well, so the court, the district judge did that which was required of the judge, wasn't it, to conduct an in-camera hearing to see whether or not under various theories it could be argued that this information was useful and came to the conclusion that it was not. And here you have a heightened security concern, don't you? The heightened security concern is that the person who supplied the information was, I assume himself, a prisoner or a person working the inside. So the disclosure of that name could cause enormous and serious repercussions. That's correct, Your Honor, and I submit that disclosure of that name, there would be certainly a weighty interest on the government side before disclosure was made. So your real complaint is that you weren't there, that you weren't there to look at. But, I mean, that's true. There are all sorts of in-camera explorations in which only one party is present. Looking at attorney-client privilege materials is one thing. Looking at police files is another. There are all sorts of inquiries that judges make, X party, or at least without the other interested party being present. As long as the right questions are asked, why is that deficient? As long as the right questions are asked is, I guess, the key. As long as the right questions are asked, we have no problem with that. But we can't be assured that the right questions were asked. I thought in this case, actually I thought in this case the judge said that there were several things, I don't have my notes right in front of me, several things that the judge wanted to know. She wanted to know, you know, the location of the tipster, the identity, whether or not this person had a, worked in the laundry, where the cell was. I mean, she asked all sorts of very good questions, didn't she? Those were some of the relevant questions. But again. What else would you have had her ask? And if you would have had her ask something, did you tell the judge, look, ask this question, ask that question? Well, that's part of the problem, Your Honor. Given the information, that's going to trigger more questions. And without knowing that, you can't, obviously you can't propose all the questions that might be relevant. That's exactly why presence at counsel is necessary. There might have been more questions that were triggered by the information that the answers of the court got. We don't know. And there's nothing, there was no harm in having defense counsel participate in that for many of the interests. That's the point here, that why not let defense counsel participate? What's the harm? I see I have just a couple minutes, so just briefly on the new trial motion. We have a case situation where the agent testified falsely. And he testified emphatically that this was the largest seizure he had ever seen, when in fact eight months earlier he submitted his sworn declaration on the case about a larger seizure. We submit that that's not. How could that possibly have made any difference if he had instead said it was the second largest and substantially larger than everything else shown in the log? I just don't understand how the outcome could possibly have been any different. Well, there's a qualitative difference between largest and second largest. In this town studios fight every day about who had the largest gross over the weekend. And we don't really care about the second largest. So there's a visceral impact to the largest. Was there also an issue about whether he had seen or whether he knew? Was that something that the district court dealt with? That's parsing. No, but I mean, was that something that the district court sort of dealt with in terms of? I don't know if the district court actually made a finding on it. I think all parties assume that certainly the import of his testimony, whether he said it literally or not, was that this was the largest seizure he'd seen. And that was contradicted by the log. The point being that the agent knew what the impact was. And I submit that that's exactly why he said it was the largest, when he knew it wasn't the largest. And that's the kind of visceral difference, qualitative difference, that can make an impact in this case. Thank you, counsel. We'll hear from the government. May it please the court, Matthew Omhoffer on behalf of the government. The district court in this case did not abuse its discretion, either when it refused to disclose the identity of a mere tipster confidential informant after doing everything that this court has required of district courts. That is, hear the evidence, hear the theory, and hold an in-camera hearing. The district court also did not abuse its discretion when it refused to grant a new trial on the basis that a government witness. Well, take the argument that your colleague just advanced. What is really the harm of having the attorney present when the in-camera proceeding takes place to suggest questions and so forth? What's the harm? Well, there really is no harm in this case, Your Honor. And I'd like to point out that the defense, that the appellant has argued that this was a hybrid or somehow unusual theory. Well, if there's no harm, why shouldn't counsel have been allowed to be there? I'm sorry. I misheard your question. Right. There is no harm in counsel not being there. That's what I'm asking. I'm asking a different question. There is really no harm in this case. There is really a harm to defense counsel being present in this case because there's always the possibility that defense counsel will find out and will find out the identity of the confidential informant and will let it leap. And that's always going to be a danger in these circumstances. But more importantly, the defense just didn't take it. That seems like your argument is that it's only because defense lawyers can't be trusted. If they were trustworthy, they could be at these hearings. It's not actually an issue of trustworthiness, Your Honor. It's simply an issue of the fact that the defense counsel might make a mistake. It's certainly not a trustworthiness issue. More importantly, the defense counsel in this case couldn't have done much without his client there. And that's really the point. There was nothing unusual about this. This Court just recently, well, excuse me, not recently, but in 1987, held in Thompson, and stated, I quote, the district court normally considers on an ex parte basis whether to reveal the identity of a confidential informant. This is the normal procedure. Now, the defense has cited Ordonez, which lists as a list of possibilities that defense counsel might be present. Well, how developed was the defense that was presented to the court? The defense was actually quite specific. And the defense, and there was really no question about what the defense was going to be. It was sort of a two-pronged defense. Either the pants made their way into the defendant's possession by mistake, or he was framed. And neither of those defenses was particularly viable. Now, the district court essentially reserved ruling on the viability of the defense because this was a pretrial motion. But now, we're after, we're in the post-trial situation, and we're essentially in the situation this court found itself in, in Henderson, which is looking back at a situation where the evidence is overwhelming. In Henderson, what you had is a bank robbery. You had two positive IDs, two non-IDs, and a picture that was not clear enough. And so they had to call the FBI agent in that case to testify, I'm looking at the surveillance picture of the bank robbery, and that's the defendant. In this case, the evidence is far stronger and far more overwhelming. The defendant is wearing pants. The pants are waist 36, length 30, the very size the defendant put down on his BOP form as his size pants. They fit him. The drugs are located in the button fly area of the crotch. And forgive me for my crassness, but the correctional officer who was searching the defendant, even when he was wearing the pants, noticed a bulge in the crotch area, an unusual size puffiness in that area. And when he began to search the pants, and he had information, the confidential informant had said that the pants, that the drugs were located in the crotch area of the pants. But he, in order not to, in order to just, his testimony was that he started on the ankles in the area of the pants just to sort of see how the defendant reacted. The moment he approached the crotch area of the pants, the defendant hung his head. And in addition to all that evidence was the evidence of the value and the amount of the drugs. There were as many as 96 hits of heroin in the crotch of this prison-issued hackies. These drugs were worth as much as $5,600 in the prison market. And as was argued before the district court, you might find a penny on the floor. You might find a quarter or a dollar. But how often do you find $100 bills? People don't misplace stuff this valuable, particularly in prison. And moreover, if somebody were attempting to frame the defendant, do you honestly think that they would need to do 10 grams of heroin as opposed to just one hit? So under any circumstance, the evidence here is overwhelming, as it was in Henderson. And this court now has the benefit of seeing how the defense has played out, seeing how the case played out. And there's really no question that comparing the quality evidence between this case and Henderson. Well, so since you're arguing that the size is really significant here, then let's take it the other step in terms of that I think it was Officer Vogel's statement that this was the largest that he'd seen when, in fact, he had these other declarations that he'd prepared. And that's right, Your Honor. And truthfully, the defense argument here is they're entitled to a new trial because this was, in fact, the second largest as opposed to the largest. There were seven seizures of heroin on Agent Vogel's watch during his time at Terminal Island. Of those seizures, there was one greater, 11.5 grams. The defendant's seizure involved 10.5 grams. The rest were between a half, 5 grams, all the way down to 0.5 grams of heroin. So if you said this is one of the largest or the second largest, then that would have been factually correct. That's correct, Your Honor. And so the point of Agent Vogel's testimony was still valid. That is, this is a heck of a lot of heroin for somebody to have in prison. But if you take the defense perspective on this, you know, obviously any impeachment that you can make of a witness is important. That's true. And so if the defense had been able to, if we could play this out, there's kind of two ways you can look at it, and let's take the impeachment idea first, that Agent Vogel says the most I've ever seen on one person. The evidence comes in that, in fact, during his time, there was one larger seizure. Now that seizure wasn't found on a person. It was found in a cell. And so technically, the statement isn't even on its face false. However, you know, we can see that there was a slightly misleading connotation to what he said. Well, but that's important in a trial, and the jury never heard that. And the jury never heard that. And so, but in this case, you look to the rest of the evidence, and in particular, you can look to the rest of Agent Vogel's testimony, because we're not in a situation like we were in Davis, where after the trial it was found out that the agent whose testimony was at issue had been stealing drug money and was indicted. Here, all you've got is one small statement. The rest of Agent Vogel's testimony still stands, and his testimony was that this was a large number of hits of heroin and of great value. And as the district court noted, that evidence still stands, even if this part is impeached. And the defense had every opportunity to cross-examine Agent Vogel on all those issues and really didn't dispute that this was a lot of heroin to be found in prison. And so the point of Agent Vogel's testimony is indeed still valid, that this was a lot of heroin to be found in prison. And, of course, the standard is whether it probably would have resulted in a new trial. And given the sheer weight of the evidence... Probably would have resulted in... Excuse me, probably would have resulted in a different outcome. That is, in the acquittal of the defendant. And here... So who's the officer that initially spots the... Officer Geyer, Correctional Officer Geyer. He receives word of the informant's tip and goes and picks the defendant out, searches the defendant, and finds the drugs in his pants. And Agent Vogel was then called in. And so under the circumstances here, there's just no question that the evidence was so overwhelming and that the rest of Agent Vogel's testimony was so compelling as to the fact that this was a lot of drugs, as the district court correctly held. And the district court... I'd encourage this court to read carefully the district court's rulings on this. There really wasn't an abuse of discretion. The district court was very careful here in terms of moving through the different arguments and the different cases. And so the government submits to the defendant. It has not shown that the district court abused its discretion, either as to the disclosure of the mere tipster or as to the issue of the new trial based on the testimony of Agent Vogel. And on that, the government would submit. Thank you. Thank you. I don't believe that you had reserved any time. So the case testarchy is submitted. We will move next to United States v. Davis. Thank you.
judges: Graber, Callahan, Breyer